**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

ROBERT B. BARKER,

       Plaintiff,

v.                                                                  Case No.: 3:09-cv-00818

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

       Defendant.

**<u>MEMORANDUM OPINION</u>**

     This action seeks a review of the decision of the Commissioner of the Social Security Administration denying plaintiff's application for a period of disability and Disability Insurance Benefits (DIB)  under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.   This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (Docket Nos. 12 and 16).  Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 7 and 8).

     The Court has fully considered the evidence and the arguments of counsel.  For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.    <u>Procedural History</u>**

     Plaintiff, Robert B. Barker  (hereinafter "Claimant"), filed an application for DIB on March 15, 2005, claiming that he had been disabled since May 8, 2002 due to "feet problems;" high blood pressure; pain in the knees; depression and anxiety; tingling and

pain in the back and buttocks. (Tr. at 82-84, 100). The Social Security Administration ("SSA") initially denied the claim on August 24, 2005 and, upon reconsideration, again denied it on December 19, 2005. (Tr. at 20).  Thereafter, Claimant filed a written request for a hearing, which was conducted on April 4, 2007 by the Honorable James D. Kemper, Jr., Administrative Law Judge (hereinafter "ALJ").  (Tr. at 33-63).  By decision dated June 12, 2007, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act and, thus, was not entitled to benefits. (Tr. at 20-32). The ALJ's decision became the final decision of the Commissioner on June 1, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 5-7).  Claimant timely filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g).  (Docket No. 2).

## II.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability.  See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims.  If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied.  20 C.F.R. §§404.1520, 416.920.  The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment.  *Id.* §§404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment.   *Id.*  §§404.1520(c), 416.920(c).  If severe

impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§404.1520(d), 416.920(d).   If the impairment does, then the claimant is found disabled and awarded benefits.   However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments.   After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§404.1520(e), 416.920(e).   If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  *Id.* §§404.1520(f), 416.920(f); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).   The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review."  20 C.F.R. § 404.1520a.  First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment.   If such impairment exists, the SSA documents its findings.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c).  Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation.  A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities.  20 C.F.R. § 404.1520a(d)(1).  Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder.  20 C.F.R. § 404.1520a(d)(2).  Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this case, the ALJ initially confirmed that Claimant met the insured status requirements of the Social Security Act through March 31, 2009.  (Tr. at 22, Finding No. 1).  Using the sequential evaluation process, the ALJ found that Claimant satisfied the first step, because he had not engaged in gainful activity since the date of the alleged onset of disability.[1]  (Tr. at 22, Finding No. 2).  Turning to the second step, the ALJ determined that Claimant had the following medically determinable severe impairments: chronic bilateral foot pain secondary bilateral plantar fascitis with plantar

---

[1] Claimant returned to work after the alleged disability onset date on two occasions pursuant to limited job duty offers.  As his work activity was brief on both occasions, the ALJ considered these returns to work to be "unsuccessful work attempts."  (Tr. at 22).

neuropathy, and tarsal tunnel syndrome; and chronic musculoskeletal low back pain. (Tr. at 22-26, Finding No. 3). The ALJ also recognized that Claimant had additional medical impairments, including knee pain, hypertension, and anxiety and depression, but did not find these conditions to be severe. (Tr. at 23-26). Considering Claimant's impairments separately and in combination, the ALJ concluded that Claimant's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. (Tr. at 26, Finding No. 4).

The ALJ then found that Claimant had the residual functional capacity to perform a range of sedentary work activities, "involving lifting/carrying no more than ten pounds maximum at any time; no climbing or balancing; no more than occasional stooping, kneeling, crouching, or crawling; pushing/pulling only to the sedentary weight level; and avoidance of hazards such as heights and moving equipment." (Tr. at 26-30, Finding No. 5). As a result, Claimant could not return to his past relevant employment as a mail carrier, which was classified by the vocational expert at the administrative hearing as requiring medium to heavy exertional activities of a semiskilled nature. (Tr. at 30, Finding No. 6). The ALJ considered Claimant's age of 43 years old at the time of the hearing, which is defined as a younger individual aged 19-49, and the fact that he completed high school and could communicate in English in finding that transferability of job skills was not material to the disability determination.[2] (Tr. at 30-31, Finding Nos. 7-9). Relying upon the testimony of a vocational expert, the ALJ concluded that Claimant could perform jobs such as non-emergency dispatcher, telephone solicitor; and clerical worker, all of which existed in significant numbers in the national economy.

---

[2]The Medical-Vocational Rules supported a finding that Claimant was not disabled regardless of whether he had transferable job skills.

(Tr. at 31, Finding No. 10). On this basis, the ALJ found that Claimant was not under a disability as defined in the Social Security Act. (Tr. at 32, Finding No. 11).

## III.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock v. Richardson, supra* at 775.

A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

## IV.   **Claimant's Background**

Claimant was forty-three years old at the time of his administrative hearing. (Tr. at 36). He completed high school and enlisted in the U.S. Navy.  (Tr. 36, 149).  In 1986, Claimant began employment as a letter carrier for the United States Postal Service and remained in that position until April 2005. (Tr. 36, 101).  Claimant's primary language was English.  (Tr. at 100).

## V.   **Relevant Medical Evidence**

The Court has reviewed all of the evidence of record in its entirety, including the medical evidence.  Inasmuch as Claimant's challenges to the Commissioner's decision primarily involve the ALJ's consideration and treatment of Claimant's severe impairments of chronic bilateral foot pain secondary bilateral plantar fascitis with plantar neuropathy, and tarsal tunnel syndrome; and chronic musculoskeletal low back pain, the Court will confine its summary of the medical documentation to those conditions.[3]

### A.   **Podiatry Treatment**

On May 8, 2002, Claimant consulted with Dr. Philip Mallory, a local podiatrist, for evaluation and treatment of pain and swelling that Claimant was having in his feet. (Tr. at 223). At that visit, Dr. Mallory advised Claimant that he did not treat workers compensation cases, so he wrote Claimant a "light duty" slip and referred him to Huntington Podiatry Associates.  (Tr. at 48, 432).  Dr. Mallory diagnosed Claimant with Tailor Bunions, tendonitis, and splay foot. (Tr. at 224).

---

[3] Claimant does not contend that the ALJ was incorrect in finding the alleged impairments of knee pain, high blood pressure, and anxiety and depression to be non-severe.  The record reflects that the ALJ thoroughly considered the severity of these conditions and appropriately employed the special technique when reviewing Claimant's mental impairments.  (Tr. at 22-26).

According to the records in evidence, Claimant began treatment with Huntington Podiatry Associates on May 15, 2002 and continued treatment, seeing both Dr. Charles Markham and Dr. Bill May, through December 2005. (Tr. at 306-430). Dr. Markham initially diagnosed Claimant with bilateral foot strain, cannot rule out stress fractures of the 4th and 5th metatarsals. (Tr. at 430). On May 29, 2002, Dr. Markham wrote an "off work" slip for Claimant, indicating that he would be fit to return to work on June 20, 2002. (Tr. at 427). Dr. Markham modified his diagnosis on Claimant's second visit, confirming that Claimant had stress fractures and strains of his feet, bilaterally, with a suspected fracture of the 4th metatarsal and capsulitis of the 5th metatarsals, bilaterally. (Tr. at 426). He placed Claimant in short boot casts and advised him to return in 3 weeks. (Tr. at 426). Dr. Markham also modified Claimant's "off work" slip, estimating that he could return to work on July 11, 2002. (Tr. at 425).

On July 10, 2002, Dr. Markham noted some improvement and decided to advance Claimant to surgical shoes. He prescribed Vioxx and recommended a bone scan. (Tr. at 423). At a follow-up visit on July 31, 2002, Claimant reported that he was having more soreness in his feet since switching to surgical shoes. (Tr. at 419). Dr. Markham returned Claimant to short boot casts and decided to request custom orthoses with the goal of returning Claimant to full time work. (Tr. at 419). On August 21, 2002, Dr. Markham noted improvement in Claimant's condition. (Tr. at 417). His plan was to continue to pursue custom orthoses for Claimant. (*Id.*). He wrote an "off work" slip for Claimant through September 17, 2002. (Tr. at 418). On August 28, 2002, Dr. Markham completed a U.S. Department of Labor Duty Status Report, indicating that Claimant could not perform his regular work duties. (Tr. at 415).

On September 16, 2002, Claimant returned to Dr. Markham's office for evaluation.  (Tr. at 409).  Dr. Markham noted that Claimant was "clinically doing better" with resolving capsulitis and bilateral foot strain.  (*Id.*).  Dr. Markham released Claimant to return to light duty on September 23, 2002 and estimated that Claimant would be able to return to full duty after his custom orthoses were obtained.   (*Id.*).  On October 14, 2002, Dr. Markham reevaluated Claimant and found that he continued to improve.  (Tr. at 407).  He recommended a work conditioning to work hardening program and indicated that Claimant was awaiting delivery of the custom orthoses.  (*Id.*).  On October 29, 2002, Dr. Markham completed a U.S. Department of Labor Work Capacity Evaluation, opining that Claimant could work an eight hour day with certain restrictions, including limitations on the amount of time Claimant could walk, stand, twist, operate a motor vehicle, push, pull, kneel, and climb.  (*Id.*).

Claimant received his custom orthoses in November 2002.  (Tr. at 403).  Dr. Markham had to adjust them over the next month, but by December 12, 2002, Claimant reported that they were more comfortable.   (Tr. at 403, 397, 398).  Dr. Markham continued Claimant on restricted duty.  (Tr. at 388, 393).  Claimant started physical therapy at Generations Physical Therapy on November 11, 2002.  On December 4, 2002, Dr. Markham received a letter from Generations Physical Therapy, indicating that Claimant had completed eleven therapy sessions and reported a 25% improvement in his symptoms.  (Tr. at 233).

On January 30, 2003, Dr. Markham documented that Claimant had finished two weeks of work conditioning and physical therapy and was suffering a worsening of his capsulitis.  (Tr. at 387).  Dr. Markham observed that Claimant was not "progressing as I would expect and he is relapsing much more easily than I would expect and in addition

his pain at the onset was more severe than I would have expected." (*Id.*).  Dr. Markham felt it would be worth ruling out some other underlying problem.  (*Id.*).  Dr. Markham referred Claimant to Dr. Lewis for an evaluation of possible fibromyalgia.  (Tr. at 386).

On February 14, 2003, Dr. Markham evaluated Claimant, noting that Claimant could not complete more than three hours of work conditioning, which left him extremely sore.  (Tr. at 384).  Dr. Markham diagnosed Claimant with "recalcitrant capsulitis" in the 5th metatarsal and bilateral faciitis likely secondary to ankle strain due to altered gait.  He provided Claimant with an ankle strap, gave him injections of pain medication in his left 5th metatarsal and suggested an electrical stimulation unit.  (*Id.*).  Dr. Markham decided to hold off on further work conditioning due to Claimant's relapse.  He indicated that Claimant's return to full duty now had an indefinite date.  (*Id.*).

In March 2003, Dr. Markham received a letter from Dr. James Becker of Marshall University's Family Practice.  (Tr. at 240).  Dr. Becker wrote that he had examined Claimant on two occasions for his bilateral foot pain.  Aside from some slight elevations of hemoglobin and ALT, Claimant's laboratory results were all normal.  Dr. Becker opined that Claimant had foot pain as a consequence of chronic recurrent fasciitis and capsulitis.  He felt that Claimant could not return to work as a postal carrier, but should be moved to an employment position that did not require constant standing, walking and carrying.  (Tr. at 240).

Dr. Markham also received a letter from Rene Arthur at Generations Physical Therapy in March 2003, who wrote that Claimant had completed 53 therapy sessions.  (Tr. at 225).  She indicated that Claimant had reported a 60% improvement in his arch pain, but still complained of 5th metatarsal pain and intermittent swelling and stiffness

of his ankles.   She opined that Claimant had reached his maximum level of improvement with physical therapy and felt that he might need job retraining.  (Tr. at 226).

On March 7, 2003, Dr. Markham examined patient in follow-up and noted that he was doing much better.  (Tr. at 379).  Dr. Markham's diagnosis was recalcitrant capsulitis with chronic synovitis and possible adhesions within the 5th metatarsal bilaterally.  (*Id.*).  Dr. Markham decided to maintain the current restrictions on Claimant's work duties, because he feared that if Claimant were placed on heavier duty, he would regress again.  Dr. Markham noted that he agreed with Claimant's work conditioning physician who suggested job modification to a different employment position.  (*Id.*).  Dr. Markham made this suggestion to the workers compensation office on April 22, 2003, stating "recommend [patient] be moved to a different job that does not require constant standing, walking, and carrying."  (Tr. at 374).

Claimant continued to suffer pain in his feet.  In June 2003, Dr. Markham suggested an EMG to rule out tarsal tunnel syndrome.  (Tr. at 366).  Dr. Markham continued Claimant on restricted work duty interspersed with periods of time when he requested that Claimant be "off work."  (Tr. at 355-373).  On July 17, 2003, Dr. Markham spoke with Dr. Debra Boender, a podiatrist at the Veteran's Administration Medical Center ("VAMC"), who agreed that an EMG was indicated.  (Tr. at 245).  Nerve conductions studies were done on August 3 and August 13, 2003.  (Tr. at 242-243 and 249).  The first study was performed by Dr. Carl McComas, a local neurologist, and was normal.  (Tr. at 243).  The second was performed at the VAMC, and the results, when correlated with the clinical findings, were suggestive of a sensory neuropathy involving the sural nerve bilaterally.  (Tr. at 249).

In September 2003, Dr. Markham documented that he was pursing pain management and neurosurgery consultations for Claimant.  (Tr. at 354).  He indicated that Claimant might have neural involvement with the capsulitis.  Dr. Markham also stated that Claimant was complaining of numbness in his left buttock and planned to undergo an MRI of his back.  (*Id.*).

On November 3, 2003, Dr. Markham wrote a lengthy note relating to his evaluation of Claimant on that day.  (Tr. at 349-350).  He commented that Claimant continued to have pain, numbness, tingling and color changes in his feet.  He reported that he could not tolerate more than an hour on his feet.  Claimant reported that he had seen a neurologist for his pain and was prescribed Amitriptylene.  (*Id.*).  On physical examination of Claimant's feet, Dr. Markham found few positive findings with the exception of a mild Tinel's on the right greater than the left.  (*Id.*).  Dr. Markham stated that Claimant's employer had failed to make the recommended changes in his job duties and had exacerbated his underlying condition.  (*Id.*).  He indicated that Claimant was appealing a denial of recent medical bills, which was based upon a six week return to work.   Dr. Markham conveyed his frustration with the position of workers compensation, stating "While the medical evidence may be thin it is based on prior subjective and objective findings and continue[s] to be so.  If someone else in the worker's comp or system wishes to not accept the [patient's] version of the truth it is up to them. I have no choice but to do so at this point and that in fact should suffice as bridging events." (*Id.*).

On January 26, 2004, Claimant returned to Dr. Markham's office reporting that he had no change in his condition.  (Tr. at 343).  He continued to have tingling of the soles of his feet and pain, which forced him to sit down after 30-45 minutes of standing.

Claimant told Dr. Markham that Dr. Carl McComas, a local neurologist, had performed a nerve conduction study on Claimant's feet that was negative, but another study performed at the VAMC was slightly positive.  (*Id.*).   Dr. Markham advised Claimant that he could not offer anything further in treatment other than a referral to a pain management specialist.  Dr. Markham stated that he was unclear as to the cause of Claimant's pain, speculating that it might be nerve entrapment or proximal in the low back as he had known disc disease.  His plan was to refer Claimant to Dr. Ahmet Ozturk, a pain management specialist.  (*Id.*).  In March 2004, Claimant advised Dr. Markham that he had been given authorization to see Dr. Ozturk and had made an appointment. (Tr. at 339).  The following month, Claimant told Dr. Markham that he had seen Dr. Ozturk, who accepted him as a patient.  (Tr. at 335).  Accordingly, Claimant asked Dr. Markham to transfer care to Dr. Ozturk to act as his primary physician.  (*Id.*).   Dr. Markham complied with this request on April 22, 2004, continuing Claimant on restricted work duty alternated with periods "off work."  (Tr. at 331, 327, 325, 322).

In late 2004, Dr. Bill May assumed the care of Claimant at Huntington Podiatry Associates.  On January 19, 2005, Dr. May wrote a letter indicating that Claimant had a history of unmanageable pain related to neuropathic changes his feet.  (Tr. at 314).  He opined that "the condition that [Claimant] has is permanent and I feel that he will be unable to return to the filling of duties that he had in the past, that he is disabled from strenuous activities such as standing, walking, and carrying loads."  (*Id.*).   Dr. May reconfirmed this opinion on February 1, 2006, when he completed a "Medical Assessment of Ability to do Work-related Activities (Physical)" form.  (Tr. at 433-435). On this form, Dr. May opined that Claimant's ability to lift and carry was limited to less than one third of an eight hour work day; his ability to walk was limited to 80 minutes

per day at intervals of 10-15 minutes without interruption; his ability to sit was unimpaired; he should never climb or balance and should only occasionally stoop, crouch, kneel or crawl; he could reach, handle, feel, see, hear, and speak normally, but had restrictions in pushing and pulling; and he should avoid heights and moving machinery.  (*Id.*).

### B.    Pain Management Treatment

According to the medical records from Cabell Huntington Hospital Regional Pain Management Center, Dr. Ahmet Ozturk first evaluated Claimant on March 10, 2004 at the request of Dr. Markham.  (Tr. at 478-482).  Claimant reported that he had "constant pins and needles from the heel to the base of the toes" that was worse on the left side. He also had sharp, stabbing, shooting pain at the head of his 5th metatarsal and mottling of both feet.  He said his feet were cold to the touch and felt as if they were being scalded when he put them in warm water. His pain subsided when he was off his feet, although the tingling and numbness remained.   (*Id.*).   Dr. Ozturk ordered a lumbar x-ray and scheduled his physical examination on March 12, 2004.  The x-ray demonstrated some narrowing of disc space at the L-5/S-1, but was otherwise normal.  (Tr. at 475).  After performing Claimant's physical examination, Dr. Ozturk diagnosed Plantar Neuropathy Bilateral; Tarsal Tunnel Syndrome could not be ruled out; Myofascial Pain Syndrome; S-1 Joint Syndrome bilateral (possible lower Facet Syndrome). (Tr. at 475-476). He recommended psychological testing; physical therapy; behavior modification to cease smoking; neuropathy cream; Neurontin; and Pamelor.[4]  (*Id.*).

---

[4] Neurontin is a medication used to treat post-herpetic neuralgia.  Pamelor is an anti-depressant that is also used to treat post-herpetic neuralgia.

Claimant received a psychological examination and began physical therapy.  (Tr. 464-472).  In a follow-up note on August 3, 2004, Dr. Ozturk commented that Claimant was "doing fairly well in regards to his pain.  He says it is the same."  (Tr. at 463).  One month later, Claimant reported some improvement from the physical therapy and was waiting to hear from the Postal Service about light duty.  (Tr. at 460).  On November 23, 2004, Dr. Ozturk documented that he had a case management meeting with Claimant and intended to work up a plan designed to get Claimant back to modified duty.  (Tr. at 459).  In March 2005, Dr. Ozturk noted that Claimant was scheduled to return to work in a modified position that allowed him to sit.  (Tr. at 454).  However, Claimant worked only nine days before receiving retirement through the Postal Service.  (Tr. at 452).

In August 2005, Claimant complained to Dr. Ozturk about an increase in back pain.  (Tr. at 448).  Dr. Ozturk requested authorization to perform an S-1 injection.  (*Id.*).  In October, Claimant asked Dr. Ozturk to help him obtain a power chair.  (Tr. at 447).  Dr. Ozturk also switched Claimant's medications to address some side effects about which Claimant complained.  (*Id.*).  On November 30, 2005, Dr. Ozturk performed the S-1 injection (Tr. at 443), which relieved 90%-95% of Claimant's back pain.  (Tr. at 442).  Claimant continued to complain of pain in both feet, however.  (Tr. at 439).

## C.    Agency Evaluations

On July 14, 2005, Dr. Kip Beard of Tri-State Occupational Medicine performed an internal medicine examination on Claimant at the request of the West Virginia Disability Determination Service ("DDS").  (Tr. at 263-268).  Claimant reported to Dr. Beard that he had intermittent, but daily, bilateral foot pain that was worse with standing or walking, especially on uneven surfaces or for prolonged periods of time.

(Tr. at 264).  He also complained of knee pain and pain in his lower back, which became worse with bending, sitting, and lifting.  (*Id.*).

On examination, Dr. Beard noted that Claimant had no assistive devices or ambulatory aids.  He walked with a mild limp, but had no difficulty getting onto the examining table and appeared comfortable while sitting.  (Tr. at 265-266).  His feet were tender to palpation, but were not red, warm, swollen, or abnormal in color.  (Tr. at 267).  Claimant could walk on his heels and toes with some foot pain and had a mild degree of difficulty squatting and rising from a squat.  (*Id.*).  He complained of tenderness in his lower back, but his straight leg test was negative for abnormal findings.  (*Id.*).  His knees were normal except for some patellofemoral crepitations.  (*Id.*).  X-rays ordered by Dr. Beard reflected a normal knee and lower back.  (Tr. at 271). Dr. Beard diagnosed chronic bilateral foot pain with bilateral plantar fasciitis; bilateral splayed 5th metatarsals by history; Morton neuropathy; and chronic lower back pain and facette degeneration with some neuroforaminal stenosis.  (Tr. at 267).

On August 17, 2005, Joyce Clay, SPM, completed a Physical Residual Functional Capacity Evaluation for the SSA.  (Tr. at 211-218).  This evaluation was subsequently reviewed by Dr. Uma Reddy, an agency consultant, who documented her agreement with the findings.  (Tr. at 218).  The reviewers found some exertional, postural and environmental limitations, but no manipulative, visual, or communicative limitations. (Tr. at 212-215).

## VI.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises five challenges to the decision of the Commissioner, arguing that he is entitled to an award of benefits, or remand of the case to the Commissioner for

further proceedings.   Claimant contends that the following errors were made by the ALJ:

1.      The ALJ disregarded the effects of Claimant's foot and back impairments;

2.      The ALJ failed to consider the cumulative effect of Claimant's back and foot pain in combination;

3.      The ALJ's failed to perform a credibility assessment of Claimant;

4.      The ALJ failed to fully develop the record; and

5.      The ALJ failed to produce evidence sufficient to rebut the presumption of disability.

(Pl. Br. at 10-15).

To the contrary, the Commissioner responds that the ALJ fully explained his determination of the limitations flowing from Claimant's impairments, both separately and in combination.   Moreover, contrary to Claimant's assertion, the ALJ performed and documented a credibility assessment as part of his overall determination.   The Commissioner points out that Claimant never identifies what portion of the record is purportedly underdeveloped.   Finally, the Commissioner argues that Claimant misunderstands the duty of the ALJ to rebut a presumption of disability.  (Tr. at 8-12).  According to the Commissioner, the ALJ's decision is well-supported by the evidence and is properly adopted as the final decision of the Commissioner.

**VII.   <u>Discussion</u>**

Having carefully scrutinized the record, the Court agrees with the Commissioner that the decision of the ALJ, and thus the Commissioner, is supported by substantial evidence.   Accordingly, a finding of "no disability" is proper.

### A.     The ALJ's Treatment of Claimant's Severe Impairments and Credibility

Because Claimant's first three challenges, as set forth above, are so closely linked, the Court will address them together.   The thrust of Claimant's challenges is that the ALJ erred by not reaching the same conclusion as Claimant regarding the limitations that his feet and back pain have on his ability to perform basic work activities.   What Claimant fails to appreciate is that the issue before the Court is not which party is more correct; instead, the issue is whether the conclusion reached by the ALJ is supported by substantial evidence.

The law is well-settled that the ALJ must consider both the individual impact of each impairment suffered by a claimant on his ability to work and the cumulative or synergistic impact of all of the impairments when viewed in combination. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).  The social security regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523.  Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974).   The ailments should not be fractionalized and considered in isolation, but considered in combination to determine their overall impact on the claimant's ability to work.  *Id.*  42 U.S.C. 423(d)(2)(B).  "It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render a

claimant unable to engage in substantial gainful activity." *Walker v. Bowen,* 889 F.2d 47, 49-50 (4th Cir. 1989).

In addition, when a claimant's impairments are based upon symptoms, including pain, the ALJ must conduct a two-step process to evaluate the functional effects of the symptoms on the claimant's ability to work. 20 C.F.R. § 404.1529. First, the ALJ must consider the objective medical evidence to discern whether the claimant has a medically determinable impairment that could reasonably be expected to produce the symptoms about which the claimant complains. *Id.* If so, then second, the ALJ must evaluate the intensity and persistence of the alleged symptoms to ascertain the extent to which they limit the claimant's capacity to work. *Id.* In performing this evaluation, the ALJ should consider all of the available evidence, including history; laboratory and physical findings; and statements and opinions from treating and non-treating medical sources, as well as statements from the claimant and other sources, such as family members, friends, and employers. *Id.* In addition to objective medical evidence, the ALJ will consider such factors as claimant's daily activities; the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; medications taken to relieve the symptoms; treatment received for relief of the symptoms; other measures taken to relieve the symptoms; and other factors relating to functional limitations and restrictions. *Id.* The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. *Id.* In the case where a claimant's statements about intensity, persistence or functional limitations are not substantiated by the objective medical

evidence, the adjudicator must "make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects."  SSR 96-7p.

A credibility determination is an assessment of the degree to which a claimant's statements "can be believed and accepted as true."  *Id.*  This assessment is made by considering the entire case record and cannot be based on an intangible or intuitive notion about a claimant's credibility.  *Id.*  The adjudicator must evaluate the medical signs and findings; the diagnosis and prognosis; the medical opinions; statements and reports from the claimant, claimant's physicians, or other persons with knowledge of the claimant's history, symptoms, treatment, response to treatment, work record and daily activities; observations by SSA employees who interviewed the claimant; and the adjudicator's own observations made during the administrative hearing.  *Id.*  Once the ALJ makes a credibility determination, he is obligated to document the reasons for his findings in a manner sufficiently specific to allow subsequent reviewers to understand the weight given to the claimant's statements and the reasons for that weight.  *Id.*

A review of the ALJ's decision reflects that the ALJ fully considered the impact of Claimant's impairments, separately and in combination, and performed the requisite two-step process in evaluating the intensity and persistence of Claimant's allegations of pain.   Initially, at step two of the sequential evaluation, the ALJ explained in detail his analysis of Claimant's alleged impairments, indicating the reasons underlying his conclusion that some of the impairments (feet and back) were severe, while others (knees, hypertension, and psychiatric) were not severe.  (Tr. at 22-26).  He noted that while the medical evidence indicated symptomatic improvement with Claimant's feet and back pain, Claimant's consistent complaints supported a conclusion that these conditions were severe and chronic.  Accordingly, the ALJ did not disregard the effect of

Claimant's musculoskeletal conditions on his ability to engage in basic work activities. To the contrary, he accepted that the conditions were severe, as alleged by Claimant, even though the objective findings engendered doubt in that conclusion.

Subsequently at step three of the sequential evaluation, the ALJ compared Claimant's impairments to the Listing to determine if they met or medically equaled the criteria of any listed impairment.  In doing so, he emphasized that when performing this comparison, he specifically examined Claimant's impairments, individually and in their entirety, against the criteria of all of the most applicable listed impairments, taking into consideration changes in the medical criteria that became effective in 2002, the year of Claimant's alleged disability onset date.  (Tr. at 26).

After completing step three of the sequential evaluation, the ALJ determined Claimant's RFC, identifying the objective medical findings and opinions upon which he relied when crafting the limitations contained in the RFC.  (Tr. at 26-30).  The ALJ afforded significant weight to the medical opinions of Claimant's treating physicians, noting that Dr. James Becker and Dr. Bill May opined that Claimant was employable, although he would require job modification to account for his inability to walk, stand, and carry on a continuous basis.  (Tr. at 26).  The ALJ also reviewed the medical records of Dr. Ozturk, commenting that these records reflected satisfactory pain control with "little in the way of objective findings aside from joint tenderness."  (Tr. at 27).  He remarked that, in December 2005, Claimant reported 90-95% pain relief in his lower back with S-1 joint injections with "better" physical functioning.  *Id.*  The ALJ clearly relied upon Dr. Ozturk's notes in considering the combined effect of Claimant's impairments, which was enitrely appropriate, as Dr. Ozturk was Claimant's primary treating physician for the totality of his pain complaints.  *Id.*

Contrary to Claimant's contention, the ALJ properly performed a credibility determination as part of his analysis of Claimant's pain. After concluding that the objective medical findings did not substantiate Claimant's statements regarding the intensity and persistence of pain, the ALJ completed the second step in his evaluation of the functional impact of Claimant's pain. The ALJ explicitly stated that he found "claimant's subjective allegations to be only partially credible and not supportive of further limitation," because the evidence as a whole did not suggest that Claimant had difficultly performing basic tasks, especially when seated. ((Tr. at 27-29). The ALJ pointed to Claimant's statements that he could pick up around the house and attend his children's activities and functions. Claimant admitted that the pain medication prescribed by Dr. Ozturk was somewhat effective in relieving his pain. *Id.* These statements are further substantiated by Claimant's comments to Kenneth Devlin, the psychologist who evaluated Claimant as part of his treatment through the Cabell Huntington Hospital Regional Pain Management Center. (Tr. at 464-470). According to Mr. Devlin's notes, Claimant described himself as "Mr. Mom" to his children when his wife was at work and clarified that his activities were extremely limited "in regard to anything that requires extended standing and walking." (Tr. at 465). Claimant did not report that his activities were substantially restricted when sitting or reclining. The ALJ expressly stated that he did not believe Claimant intentionally tried to be misleading in his subjective presentation; however, when examining the evidence in its entirety, Claimant simply was not disabled from all competitive, remunerative work activity. (Tr. at 23, 30). The Court finds that the ALJ conducted a thorough assessment of Claimant's impairments and credibility, applying the appropriate analytical processes at each step

of the evaluation.  Accordingly, Claimant's first three challenges to the Commissioner's final decision are without merit.

### B.    The ALJ's Duty to Develop the Record

Claimant next contends that the ALJ failed to fully develop the record; however, Claimant offers no insight into the manner in which the record was lacking.  Claimant fails to identify any subject matter that should have been more thoroughly addressed by the ALJ.  Likewise, he makes no mention of significant medical examinations or records that were missing from consideration.

While the ALJ had a duty to fully and fairly develop the record, he was not required to act as Claimant's counsel.  *Clark v. Shalala,* 28 F.3d 828 (8th Cir. 1994).  The ALJ had the right to assume that Claimant's counsel was presenting Claimant's strongest case for benefits.  *Nichols v. Astrue,* 2009 WL 2512417 *4 (7th Cir. 2009), citing *Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387,391 (7th Cir. 1987).  Moreover, the ALJ's duty to develop the record did not mandate that he request additional documentation or examinations "as long as the record contain[ed] sufficient evidence for the administrative law judge to make an informed decision."  *Ingram v. Commissioner of Social security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); See also, *Weise v. Astrue,* 2009 WL 3248086 (S.D.W.Va.).   When considering the adequacy of the record that was before the ALJ, the Court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to the claimant.  *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record.  Instead, remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant.  *Id.*

In this case, the ALJ had detailed records of examinations, assessments, consultations, laboratory and radiological studies created by or at the request of Claimant's treating physicians.  The medical evidence thoroughly covered the history and onset of Claimant's alleged impairments, as well as treatment of the conditions through the middle of 2006.  In addition, the ALJ questioned Claimant extensively at the administrative hearing regarding his current treatment, symptoms, activities, and limitations.  (Tr. at 38-59).  Neither the testimony of the Claimant nor the medical records in evidence suggest the existence of evidentiary gaps that would result in unfairness or prejudice to Claimant.   Instead, the testimony and the records indicate that Claimant's medical conditions were essentially the same at the time of the hearing as they were described to be in the medical records.  Moreover, the ALJ held the record open for a period of thirty days after the hearing to allow Claimant an opportunity to submit additional psychiatric records from the VAMC.   (Tr. at 62).   Certainly, if supplementary key or persuasive medical evidence existed, the ALJ could reasonably assume that Claimant would submit it within that thirty day period; especially after now having the benefit of knowing what information was pivotal to the ALJ and the vocational expert, as expressed at the hearing.

Similarly, the ALJ had the right to presume that if Claimant had experienced a significant worsening of his conditions between the last 2006 records and the administrative hearing, then either Claimant or his counsel would have presented that information to the ALJ prior to his decision.   In fact, the ALJ confirmed this presumption in his decision, stating "since early 2006, no additional medical evidence has been received to support significant worsening of the claimant's condition and as such, given the evidence as detailed herein, the undersigned finds that the assessment

previously submitted by Dr. May remains reasonable."  (Tr. at 27).  The Court finds that this conclusion by the ALJ was supported by substantial evidence.

### C.    Duty of ALJ to Rebut a Presumption of Disability

At the fourth step of the sequential evaluation used to adjudicate disability claims, the SSA recognizes that when a claimant proves the existence of severe impairments, which prevent the performance of past relevant work, the claimant has established a *prima facie* case of disability.  The burden then shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  20 C.F.R. §§404.1520(g); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy.  *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ("grids"), "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity."  *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); See also 20 C.F.R. § 404.1569.  However, the grids consider only the "exertional" component of a claimant's disability in determining whether jobs exist in the national economy that the claimant can perform.  *Id.*  For that reason, when a claimant has significant nonexertional impairments or has a combination of exertional

and nonexertional impairments, the grids merely provide a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* In those cases, the ALJ must prove the availability of jobs through the expert testimony of a vocational expert. *Id.* As a corollary to this requirement, the ALJ has the right to rely upon the testimony of a vocational expert as to the availability of jobs types in the national economy that can be performed by the claimant as long as the vocational expert's opinion is based upon proper hypothetical questions that fairly set out all of the claimant's severe impairments. See *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).

In the present case, the ALJ recognized that Claimant's severe pain was a nonexertional impairment. *Walker v. Bowen,* 876 F.2d 1097, 1099 (4th Cir. 1989). Therefore, he properly relied upon the testimony of a vocational expert in determining that jobs existed in significant numbers in the national economy that Claimant could perform. (Tr. at 31). Claimant makes no argument that the vocational expert was not qualified to render opinions, or that her opinions were based upon incomplete or inaccurate hypothetical questions. Indeed, the vocational expert was present throughout the administrative hearing and had the opportunity to listen to Claimant's descriptions of his pain and its resulting functional limitations. (Tr. at 34-35). In view of these circumstances, the Court finds that the ALJ fulfilled his obligation to obtain vocational testimony on the subject of job availability. The vocational expert determined that jobs did exist in significant numbers in the economy that Claimant could perform despite his impairments and functional limitations. Consequently, the decision of the Commissioner that Claimant was not under a disability was supported by substantial evidence.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED**: January 7, 2011.

Cheryl A.  Eifert
United States Magistrate Judge